

**SO ORDERED.**

**SIGNED this 31 day of March, 2015.**

_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:                                                              CASE NO. 14-04063-5-DMW

DANNY ARTHUR GARRETT
                                                                    CHAPTER 7
           DEBTOR.

## ORDER DISMISSING CASE FOR ABUSE

This matter comes on to be heard upon the Motion to Dismiss Chapter 7 Proceeding Pursuant to 11 U.S.C. §§ 707(b)(1) and 707(b)(3) ("Motion to Dismiss") filed by the United States Bankruptcy Administrator ("BA") on September 22, 2014, and the response filed by Danny Arthur Garrett ("Debtor") on October 14, 2014. The court conducted a hearing in Raleigh, North Carolina on December 10, 2014. Brian C. Behr, Esq. appeared on behalf of the BA, and Travis Sasser, Esq. appeared for the Debtor. At the conclusion of the hearing, the court took the matter under advisement and allowed the parties to file supplemental briefs in support of their positions. The BA and the Debtor filed memoranda of law on January 8, 2015 and January 9, 2015, respectively. Based upon the evidence presented and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

A.    BACKGROUND.

1.    The Debtor filed a petition for relief under Chapter 7 of the United States Bankruptcy Code ("Code") on July 15, 2014 ("Petition Date"). The Debtor's debts are primarily consumer debts.

2.    On August 21, 2014, the BA filed a Motion requesting an Order, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, requiring the Debtor to provide the BA with various financial documents, including pay advices, copies of bank statements and evidence of charitable contributions.

3.    The BA filed a Notice of Presumed Abuse on August 22, 2014 and filed the Motion to Dismiss 30 days later in accordance with § 704(b)(2) of the Code.

4.    On November 5, 2014, the BA filed a Motion requesting an Order, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, requiring the Debtor to appear for examination under oath. The court granted that Motion on November 7, 2014, and the BA examined the Debtor on November 20, 2014.

5.    The Debtor is 69 years of age. He is employed full time as a Manager at EMC Corporation ("EMC"). The Debtor also works between 20 and 60 hours a week, depending on the season, as a Food Service Manager at Agape Kure Beach Ministries ("Agape").

6.    On Schedule I filed with the court, the Debtor reports net monthly pay in the amounts of $1,435.77 from EMC and $1,100.00 from Agape. The Debtor also receives $2,155.00 in Social Security benefits and $654.00 in pension benefits from Armstrong World Industries each month.

7. <u>Debtor's Primary Residence</u>.

a. The Debtor owns real property ("Residence") located at 5530 Hamstead Crossing in Raleigh, North Carolina. The Debtor bought the Residence in 2006 as joint tenants with Omar Euceda. Mr. Euceda was the Debtor's domestic partner at the time.

b. Sometime in 2010, Mr. Euceda was arrested and subsequently detained because he is not a legal citizen of the United States. Mr. Euceda was ultimately deported to Honduras, and the Debtor now owns the Residence in fee simple. The Debtor makes monthly mortgage payments in the approximate amount of $1,300.00 per month.

8. <u>Apartment at Laurel Springs</u>. Sometime in late 2012 or early 2013, the Debtor began leasing a unit at Laurel Springs Apartments ("Laurel Springs Property") in Raleigh, North Carolina for his current partner, Matthew Barefoot. The monthly rent that the Debtor pays for the Laurel Springs Property is $690.00, plus utilities.

9. <u>Mr. Barefoot</u>.

a. Mr. Barefoot is 21 years old and is attending classes at Wake Technical Community College in Wake County, North Carolina.

b. Mr. Barefoot works part time at Agape and earns approximately $10.00 per hour. Mr. Barefoot earned approximately $3,600.00 in 2013. The Debtor estimates that Mr. Barefoot earned less working at Agape in 2014 than he did in 2013, with a total income in 2014 of approximately $2,000.00.

c. The Debtor shares a joint bank account with Mr. Barefoot and deposits funds into that account each month. During the period from January 1, 2014 through June 30, 2014 ("Means Testing Period"), the Debtor deposited an average of $1,800.66

each month into the account for Mr. Barefoot's benefit. This amount is exclusive of the monthly rent the Debtor pays for the Laurel Springs Property.

10. <u>The Debtor's Vehicles</u>. The Debtor owns two vehicles, a 2006 Jeep Liberty ("Jeep") and a 2005 Infiniti G35-V6 Sedan ("Infiniti").

    a.    <u>Jeep</u>.

        i.    The Debtor purchased the Jeep with Mr. Euceda on December 20, 2006. In December, 2013, the Debtor and Mr. Euceda (through the Debtor with power of attorney) attempted to transfer title to the Jeep to Mr. Barefoot. Upon submitting the form to the North Carolina Division of Motor Vehicles, the Debtor was informed that in order to avoid tax implications, the Debtor should transfer title into his name only. Title to the Jeep is in the Debtor's name.

        ii.    On December 28, 2013, the Debtor granted a lien on the Jeep to Fast Auto Loans, Inc. in exchange for a loan in the amount of either $1,250.00 or $1,500.00 (the Debtor cannot recall the exact amount). According to the Debtor, when that amount was paid in full, within two days the Debtor took out a new loan in the same amount and granted a new lien on the Jeep to Fast Auto Loans, Inc. This second lien was granted July 3, 2014, twelve days before the Petition Date. According to the Debtor, the borrowed funds were necessary to pay school expenses for Mr. Barefoot.

    b.    <u>Infiniti</u>.

        i.    The Debtor purchased the Infiniti in March, 2014, using funds in the amount of $12,500.00, given to him by his sister. At the hearing the Debtor testified that the funds were "in between" a loan and a gift, with no formal loan

agreement in place, but the general intent to pay the sister back "someday, when [the Debtor] can."

  ii. Although the Debtor purchased the Infiniti, the vehicle was originally titled in Mr. Barefoot's name only. On July 10, 2014, five days before the Petition Date, Mr. Barefoot transferred title of the Infiniti into joint ownership between him and the Debtor. According to the Debtor, this transfer was for insurance purposes and for pre-bankruptcy planning because he knew that in his Chapter 7 bankruptcy, it would be "advantageous to have a second car."

  iii. The same day as he took title to the Infiniti, the Debtor executed a Promissory Note ("Infiniti Note") secured by the Infiniti. Pursuant to the terms of the Infiniti Note, Ann Griffin lent to the Debtor the amount of $2,000.00, to be repaid on or before July 1, 2015 with no interest accruing. According to the Debtor, the $2,000.00 was necessary to pay school expenses for Mr. Barefoot.

11. <u>Toyota Camry</u>.

 a. On September 19, 2014, approximately two months after the Petition Date, the Debtor financed the purchase of a 2012 Toyota Camry ("Camry") through First Investors Financial Services ("First Investors").

 b. The monthly contractual payment due to First Investors was $445.94. According to the Debtor, although the Camry was titled in the Debtor's name, Mr. Barefoot was going to make the monthly payments to First Investors. At the hearing, when confronted with the impossibility that Mr. Barefoot could afford a $445.94 monthly payment with his $10.00 per hour part time job, the Debtor acknowledged that there was

5

"some chance" the Debtor would have ended up making the monthly payments on the Camry.

        c.     As it turned out, Mr. Barefoot totaled the Camry in a wreck on October 31, 2014, before the first payment was due to First Investors. The Debtor's vehicle insurance paid the full amount due to First Investors on the loan, and the Debtor has no additional liability to First Investors.

12.    <u>Payments to Mr. Euceda</u>. Since the time when Mr. Euceda was deported, the Debtor has been sending funds to Mr. Euceda and his 13 family members in Honduras. At the hearing, the BA submitted as Exhibit 5 a record of the funds the Debtor sent to Mr. Euceda between January 4, 2014 and August 25, 2014. During the Means Testing Period, the Debtor sent an average of $1,214.00 per month to Mr. Euceda.

13.    <u>Legal Fees for Mr. Euceda</u>. The Debtor claims he spent approximately $30,000.00 in legal fees and expenses attempting to free Mr. Euceda in 2010, and these expenditures set him on a path of financial decline.

14.    The Debtor testified that over the years, he has been able to stay relatively current on his debt obligations; however, on May 22, 2014, Springleaf Financial Services of America ("Springleaf") initiated a collections proceeding against the Debtor in Wake County designated as Case No. 14 CV 7555. The filing of the Debtor's petition stayed those proceedings.

B.    JURISDICTION.

1.    This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2.      The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

C.      DISCUSSION.

1.      Section 707(b)(1) of the Code permits the court to dismiss a debtor's case if the debtor's debts are primarily consumer debts, and the court finds that granting the debtor relief would be an abuse of the provisions of Chapter 7 of the Code.

2.      The BA asserts that the Debtor's case is presumed to be an abuse under § 707(b)(2)(A), and that the totality of the circumstances of the Debtor's financial situation indicates abuse under § 707(b)(3)(B). The BA, as the moving party in this matter, has the burden of proving abuse under § 707. *In re Hammock*, 436 B.R. 343, 347 (Bankr. E.D.N.C. 2010).

3.      <u>Presumed Abuse Under § 707(b)(2)(A)</u>.

a.      Section § 707(b)(2)(A) of the Code implements a formulaic approach for the court to follow in determining whether abuse is presumed to exist. The formula begins by looking at a debtor's income during the Means Testing Period, the six months prior to the petition date. Specifically, § 707(b)(2)(A) takes a debtor's current monthly income ("CMI") as defined in 11 U.S.C. § 101(10A), subtracts certain monthly expenses enumerated in §§ 707(b)(2)(A)(ii)-(iv) and multiplies the resulting amount by 60 to determine a debtor's projected disposable income over 60 months ("707(b) Disposable Income").

b.      These calculations comprise what is commonly referred to as the means test ("Means Test"). If under the Means Test a debtor's 707(b) Disposable Income is greater than or equal to "(I) 25 percent of the debtor's nonpriority unsecured claims in the

7

case, or $7,475, whichever is greater; or (II) $12,475,[1]" the debtor's case is presumed to be an abuse. 11 U.S.C. § 707(b)(2)(A)(i).

c.  The Debtor's Means Test calculates his 707(b) Disposable Income to be $7,117.20, which does not trigger the presumption of abuse under § 707(b)(2)(A)(i).  The BA disagrees, arguing that the Debtor incorrectly omitted income during the Means Testing Period, and that amount should be considered a part of the Debtor's CMI.  The BA also asserts the Debtor took certain deductions that are not allowed under the Code.

d.  According to the BA, if the amount that was incorrectly omitted from the Debtor's CMI were added back into the Debtor's Means Test income, and the Debtor's deductions were adjusted, the result would be a higher 707(b) Disposable Income that would trigger the § 707(b)(2)(A)(i) presumption of abuse.  In this case, a net increase of $89.29 or more to the Debtor's CMI would trigger the presumption of abuse.

e.  The BA asserts that the Debtor received funds from various sources during the Means Testing Period that should be counted as part of the Debtor's CMI, including the following:

i.  <u>Sale of Stock Pursuant to the Debtor's Employee Stock Purchase Program</u>.  The Debtor received approximately $1,789.57 related to his Employee Stock Purchase Program at EMC during the Means Testing Period.  The Debtor testified that these funds were a refund of deductions he had taken out of paychecks prior to the Means Testing Period in anticipation of purchasing EMC stock.  Including these funds would increase the Debtor's CMI by $298.26.

---

[1] The figures corresponding to $7,475 and $12,475 are adjusted every three years based upon the Consumer Price Index.  The latest adjustment was on April 1, 2013. 11 U.S.C. § 104(a).

8

      ii.    <u>401k Distributions</u>. The Debtor withdrew approximately $1,701.18 from his 401k account during the Means Testing Period. Including these funds would increase the Debtor's CMI by $283.53.

      iii.    <u>Funds Withdrawn against Life Insurance Policy</u>. The Debtor has two whole life insurance policies with John Hancock Financial. The Debtor withdrew $796.34 from these policies during the Means Testing Period. The Debtor testified that he has no obligation to return any funds to the policies, but all withdrawals (plus interest) reduce the payout that would be available to the policy beneficiary in the event of the Debtor's death. Including these funds would increase the Debtor's CMI by $132.72.

      iv.    <u>Funds Received from the Debtor's Sister</u>. As stated above, the Debtor's sister gave him approximately $12,500.00 to purchase the Infiniti. A portion of those funds, in the amount of $5,000.00, was given to the Debtor during the Means Testing Period. Including these funds would increase the Debtor's CMI by $833.33.

      v.    <u>2010 North Carolina Tax Refund</u>. During the Means Testing Period, the Debtor received a refund in the amount of $1,528.32 from the North Carolina Department of Revenue related to his 2010 income taxes. Including these funds would increase the Debtor's CMI by $254.72.

      vi.    <u>Unidentified Deposits into the Debtor's Account</u>. The Debtor deposited a total of $8,150.54 into his bank account during the Means Testing Period for which he was unable to provide any explanation to the BA regarding

the source of the funds. Including these funds would increase the Debtor's CMI by $1,358.42.

f.  The BA also asserts the Debtor incorrectly deducted certain amounts on the Means Test, including $43.01 for whole life insurance policy payments that are not eligible for deduction; $60.00 for internet services that are already included in the housing expenses deduction on Line 20A; and two deductions for $517.00 as "ownership expenses" for the Jeep and the Infiniti, despite the fact that the Debtor only expends an average of $58.00 each month in secured debt payments on the Jeep and Infiniti.

g.  The BA acknowledges that on Line 25 of the Debtor's Means Test, where the Debtor deducted $700.00 for payroll taxes, the amount should actually be higher. The BA estimates that the Debtor should deduct $952.00 on Line 25 but cannot confirm this is the correct amount due to insufficient information about the Debtor's future tax obligations.

h.  If any single category of the funds the BA asserts is income is added into the Debtor's CMI, the presumption of abuse would arise. The court is troubled by the Debtor's inability – or unwillingness – to explain over $8,000.00 in funds that were deposited into his account over the six month Means Testing Period.

i.  The Means Test also does not reflect the appropriate deductions that the Debtor should have taken. For example, the court does not believe the Local Standard for transportation ownership/lease expenses is applicable when a debtor has a secured payment due on a vehicle. The Debtor should be limited to deducting the *actual* average contractual payments for the Jeep and the Infiniti on Line 42, and the Local Standard expense deduction of $517.00 per vehicle should be disallowed as a deduction.

j. The Debtor's Means Test is incomplete and erroneous. A complete overhaul would be necessary before it accurately reflects the Debtor's CMI and corresponding 707(b) Disposable Income. The Debtor's Means Test, if it were adjusted in accordance with only a select few of the BA's objections, would indicate a presumption of abuse; however, given the facts and circumstances of the Debtor's case, the court will find abuse under the totality of the circumstances analysis of § 707(b)(3)(B) of the Code, rather than the formulaic approach of the Means Test.

4. <u>Abuse Under § 707(b)(3)(B)</u>.

a. Section 707(b)(3)(B) gives the court authority to dismiss a case in which "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B). The court may dismiss a case for abuse under § 707(b)(3) regardless of whether a debtor's Means Test indicates a presumption of abuse. 11 U.S.C. § 707(b)(3)(B).

b. In making such a determination, the court should examine both the Debtor's financial situation as of the Petition Date, as well as how his circumstances have evolved since the Petition Date. *See In re Penninger*, 2011 Bankr. LEXIS 2682, at *4-5 (Bankr. M.D.N.C. July 8, 2011).

c. The Fourth Circuit Court of Appeals set out a five-factor test for evaluating the totality of circumstances in a case of alleged abuse in *Green v. Staples*, 934 F.2d 568 (4th Cir. 1991). While acknowledging that a debtor's ability to pay creditors is the primary factor a court should consider, the *Green* court stated that a court should also consider:

> (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment;

11

>   (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
>   (3) whether the debtor's proposed family budget is excessive or unreasonable;
>   (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
>   (5) whether the petition was filed in good faith.

*Green*, 934 F.2d at 572.

   d.   Although *Green* was decided prior to the enactment of BAPCPA, the factors continue to serve as guidance for evaluating the totality of a debtor's circumstances. *Bankr. Adm'r v. Gregory*, 471 B.R. 823, 829 (E.D.N.C. 2012). The BAPCPA amendments actually lowered the standard applied in *Green*, as § 707(b)(3) now deals with "abuse" rather than "substantial abuse." The court will examine the Debtor's circumstances, as of the Petition Date and post-petition, by considering each of the *Green* factors as well as the Debtor's ability to repay creditors.

   e.   <u>Whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment</u>.

      i.   The BA asserts there was no event that led to the Debtor filing his petition, and rather, consistently irresponsible spending habits eventually forced the Debtor to seek relief. The Debtor testified that Mr. Euceda's arrest in 2010 resulted in approximately $30,000.00 in legal fees and other expenses. When efforts to avoid deportation were unsuccessful, the Debtor also lost a source of income to pay for the house he and Mr. Euceda had owned together. Although these events are somewhat removed from the July, 2014 Petition Date, the court finds they certainly contributed to the decline in the Debtor's financial circumstances.

    ii. For that reason, the first *Green* factor slightly weighs in favor of the Debtor; however, the Debtor's failure to impose upon himself the belt-tightening that could have prevented his subsequent financial deterioration results in the remaining *Green* factors falling in favor of the BA.

  f. <u>Whether the Debtor incurred cash advances and made consumer purchases far in excess of the Debtor's ability to repay</u>.

    i. The Debtor does not necessarily have the type of consumer debt that this court often sees, accumulated by a debtor that purchases consumer goods for himself beyond his budget.  In this case, the Debtor's ongoing consumer purchases are not primarily for his benefit but are instead primarily for Mr. Barefoot's benefit.  This distinction does not change the fact that the Debtor's consumer purchases were in excess of his ability to repay creditors.  The Debtor has been leasing the Laurel Springs Property for Mr. Barefoot to his creditors' detriment.  Money that could have been used to pay his mortgage, utilities and credit card bills has instead been used to support Mr. Barefoot in a separate residence.

    ii. Although it was purchased post-petition, the Camry also weighs against the Debtor in this analysis.  The Camry payments clearly would have been beyond Mr. Barefoot's ability to pay, so the Debtor would have been footing that bill as well.  The court imagines that, consistent with his past behavior, the Debtor would have paid the Camry payments at the expense of other creditors.

  g. <u>Whether the Debtor's proposed family budget is excessive or unreasonable</u>.

  i. The court is aware that many single debtors include in the budget expenses that support a significant other whom they are not legally bound to support, and those expenses are not always allowed by the court. *See DeAngelis v. Ramsay (In re Ramsay)*, 440 B.R. 85, 94 (Bankr. M.D. Pa. 2010) (finding that the debtor failed to show he had an obligation to support his fiancée's children). Filing a bankruptcy petition subjects debtors to the court's discretion as to whether certain expenditures are reasonable.

  ii. The Debtor is paying for two residences within the same city. He is currently paying monthly mortgage payments for his Residence, as well as monthly lease payments for the Laurel Springs Property where Mr. Barefoot resides. The Debtor explained at the hearing that Mr. Barefoot lives at a separate residence, in part, because Mr. Barefoot's younger sibling has been living with him. This explanation is insufficient to justify the Debtor paying for Mr. Barefoot's housing expenses. It is unreasonable and outrageous for the Debtor to expend $690.00 each month, not including utilities, to pay for a separate residence for Mr. Barefoot.

  iii. Although less relevant to the traditional understanding of a "family budget," the Debtor's monthly payments to Mr. Euceda should also be considered under this factor of the *Green* test. Since Mr. Euceda was deported, the Debtor has chosen to send money to Mr. Euceda each month that could otherwise be paid to the Debtor's creditors. These expenditures should not be included in the

14

Debtor's budget. *See In re Dominguez*, 166 B.R. 66, 69 (Bankr. E.D.N.C. 1994) ("The court finds entirely unpersuasive the debtor's contention that his excess income should be used to support his family in Puerto Rico.").

        iv.      According to the BA's calculations, if the funds that were spent on supporting Mr. Barefoot and Mr. Euceda were instead used to pay unsecured creditors (presumably during the Means Testing Period), the Debtor could have reduced his unsecured debts by 22%. The Debtor's decision to ignore his responsibilities to his creditors – obligations that should be included in the Debtor's budget – renders his proposed budget unreasonable

    h.    <u>Whether the Debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition</u>. As became clear at the hearing, the Debtor's Schedules do not accurately reflect the Debtor's financial condition. The Debtor testified that the money he spends each month is significantly higher than the amounts listed on Schedule J. Similarly, the BA identified multiple non-paycheck deposits into the Debtor's bank account during the Means Testing Period. The Debtor could provide no details or explanation of this income.

    i.    <u>Whether the petition was filed in good faith</u>. Although the court is sympathetic to the Debtor's desires to help those who are unwilling or unable to support themselves, the Debtor's bankruptcy filing exhibits bad faith. Debtors cannot choose to give unreasonable amounts of money to friends and loved ones instead of paying debts on which they are legally obligated. Debtors cannot transfer title of a second vehicle into their name and place a *de minimus* lien on the vehicle on the eve of bankruptcy, in an effort to claim the $517.00 Local Standard deduction for vehicle ownership expenses.

The Debtor has taken all of these actions and has generally failed to reduce expenses, resulting in his current financial situation. The court does not believe the Debtor's petition was filed in good faith as that standard applies to § 707(b)(3).

  j.  The majority of the *Green* factors weigh in favor of the BA's position. The court finds that under the totality of the circumstances surrounding the Debtor's case, the Debtor's case must be dismissed for abuse.

  k.  The BA's Motion did not advocate for conversion to Chapter 13. At the hearing, counsel for the Debtor speculated that a Chapter 13 would have the same outcome as a Chapter 7, to the extent that unsecured creditors would not receive a distribution under either scenario. The court agrees. The Debtor has demonstrated he is oblivious to the financial responsibilities of a bankruptcy debtor, and Chapter 13 would only frustrate the court and the creditors. Conversion to Chapter 13 is not a viable option; now therefore,

It is ORDERED, ADJUDGED and DECREED that the Debtor's case be, and hereby is, dismissed.

END OF DOCUMENT